IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION

| | |
|---|---|
| CYNTHIA A. BOWLES, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|  v. | ) Case No. 04-3572-CV-S-REL-SSA |
| | ) |
| JO ANNE BARNHART, Commissioner | ) |
| of Social Security, | ) |
| | ) |
|     Defendant. | ) |

**ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Cynthia A. Bowles  seeks review of the Commissioner of Social Security's final

order denying her application for disability insurance and widow's insurance benefits under Title

II of the Social Security Act ("the Act"), 42 U.S.C. § 401, et seq.  Plaintiff argues that the ALJ (1)

erred in discrediting her subjective complaints of pain, and (2) failed to consider the severity of  her

impairments in combination.  I find that the ALJ properly found Plaintiff's testimony was not

credible and did consider the totality of Plaintiff's impairments in finding that she was not disabled.

Therefore, Plaintiff's motion for summary judgment will be denied and the decision of the

Commissioner will be affirmed.

*I.  BACKGROUND*

On July 12, 2002, Plaintiff applied for a period of disability and disability insurance benefits

alleging that she had been disabled since June 27, 2001.[1]  Her disability stems from kidney problems

and the pain alleged to be associated with a renal cyst.  Plaintiff's application was denied initially.

---

[1] Plaintiff previously filed an application for disability benefits for an alleged disability stemming from the same impairment.  Her application was denied on February 5, 2002, and became final when she did not appeal within the prescribed time limit.  The ALJ declined to reopen the February 5, 2002 determination when considering Bowles' July 12, 2002 application (Tr. at 14).

On November 4, 2003, a hearing was held before an Administrative Law Judge (ALJ). Plaintiff then filed an application for disabled widow's insurance benefits on November 13, 2003. Because the issue of disability was the same in both applications, the ALJ considered both claims at the same time. On March 5, 2004, the ALJ found that Plaintiff was not under a "disability" as defined in the Social Security Act. On October 26, 2004, the Appeals Council denied Plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987), citing Steadman v. Sec. & Exch. Comm'n, 450 U.S. 91, 99 (1981).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n.5 (8th Cir. 1991). However, the substantial

evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Jernigan, 948 F.2d at 1073 n.5, quoting Baker v. Heckler, 730 F.2d 1147, 1150-51 (8th Cir. 1984); Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.  BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

Because Plaintiff is applying both for disability insurance benefits and widow's insurance benefits, she must prove entitlement to each, respectively.  First, an individual claiming disability benefits has the burden of proving she is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A).  If the plaintiff establishes that she is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?
                    Yes = not disabled.
                    No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits her ability to do basic work activities?

No = not disabled.
Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

Yes = disabled.
No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

No = not disabled.
Yes = go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

Yes = disabled.
No = not disabled.

In addition, to be entitled to benefits as a disabled widow, a claimant must be at least fifty years old, but less than sixty years old. 20 C.F.R. § 404.335(c). Furthermore, the alleged disability must have started not less than eighty-four months after either the insured wage earner died or the widow was last entitled to mother's benefits. 20 C.F.R. § 404.335(c).

## *IV. THE RECORD*

The record consists of the testimony of Plaintiff and the vocational expert Dr. Cathy Hodgson, in addition to documentary evidence admitted at the hearing.

## *A. ADMINISTRATIVE REPORTS*

The record contains the following administrative reports:

### Earnings Record

Plaintiff's earnings record indicates that she eared the following income from 1968 through 2003:

4

| Year | Income | Year | Income |
|------|--------|------|--------|
| 1968 | $ 304.20 | 1986 | $ 0.00 |
| 1969 | 745.80 | 1987 | 0.00 |
| 1970 | 0.00 | 1988 | 0.00 |
| 1971 | 0.00 | 1989 | 0.00 |
| 1972 | 1,150.58 | 1990 | 3,069.29 |
| 1973 | 1,537.97 | 1991 | 7,051.05 |
| 1974 | 1,479.31 | 1992 | 8,542.44 |
| 1975 | 1,917.17 | 1993 | 8,100.19 |
| 1976 | 0.00 | 1994 | 6,419.64 |
| 1977 | 0.00 | 1995 | 8,783.41 |
| 1978 | 0.00 | 1996 | 6,819.57 |
| 1979 | 0.00 | 1997 | 9,267.31 |
| 1980 | 0.00 | 1998 | 10,329.49 |
| 1981 | 0.00 | 1999 | 1,848.15 |
| 1982 | 0.00 | 2000 | 9,642.36 |
| 1983 | 28.32 | 2001 | 473.91 |
| 1984 | 1,328.53 | 2002 | 0.00 |
| 1985 | 0.00 | 2003 | 0.00 |

(Tr. at 62).

## B. SUMMARY OF MEDICAL RECORDS

The following is a summary of the medical records that are relevant to the issues in this case, to the extent they are legible. This court notes that because the ALJ did not reopen the first hearing (Tr. at 14), the doctrine of *res judicata* precludes reevaluation of medical records dated before the date on which Plaintiff was initially denied benefits for the same impairment. Ellis v. Barnhart, 392 F.3d 988, 990 n.2 (8th Cir. 2005); Bladow v. Apfel, 205 F.3d 356, 360 n.7 (8th Cir. 2000); Janka v. Sec'y of Health and Educ., 589 F.2d 365, 367 (8th Cir. 1978). However, prior medical evidence can serve "as a background for new and additional evidence of deteriorating . . . physical conditions occurring after the prior proceeding." Bladow, 205 F.3d at 360 n.7, quoting Robbins v. Sec'y of Health and Human Servs., 895 F.2d 1223, 1224 (8th Cir. 1990). It is within this context that Plaintiff's medical records prior to February 5, 2005, are

considered.

Plaintiff's medical records evidence a history of kidney problems stemming from a recurrent renal cyst. An X-Ray first identified a cyst in Plaintiff's "right anterior mid renal parenchyma" on February 16, 1998 (Tr. at 196, 199, 200). Plaintiff presented to Dr. Magill at Associates in Women's Health Care on February 28, 2001, complaining of lower abdominal and back pain after falling at work (Tr. at 156). Dr. Magill prescribed two Robaxin[2] 750mg tablets four times a day for three days and two Tylenol 3 tablets three times a day thereafter and also recommended that she under go an ultrasound (Tr. at 156). A radiography fluoroscopy was performed on March 1, 2001, which showed kidney stones in Plaintiff's left kidney, and a 6 cm mass on the lower pole of her right kidney (Tr. at 171-172). A CT scan further confirmed the existence of the cyst. Upon review of the CT report, Dr. Barry S. Farber, M.D., noted that the cyst was "most likely . . . not related to her pain" and scheduled a follow-up appointment for "reassurance that the right renal cysts are not causing her pain" (Tr. at 118, 169).

On April 5, 2001, Plaintiff saw Dr. Thomas C. Pearson, M.D. Plaintiff reported no left flank pain, but described an "intermittent burning sensation of her right flank and abdomen" that limited her ability to perform normal daily functions and work (Tr. at 117). Dr. Pearson noted that, "[g]iven the nature of her pain that is in her anterior abdomen and intermittent, I could not be convinced that [the cyst] is the cause of her pain" (Tr. at 117). Plaintiff's cyst was ultimately drained on April 10, 2001 (Tr. at 73, 98).

On July 2, 2001, Plaintiff underwent a kidney ultrasound biopsy ("KUB") (Tr. at 117). The KUB showed that the cyst was 3.5 cm in size, indicating that it may be returning (Tr. at

---

[2]Robaxin is a muscle relaxant.

117).  At a follow-up appointment with Dr. Pearson, Plaintiff reported continued low, mid back

pain, but no true flank pain (Tr. at 117).  Dr. Pearson and Plaintiff discussed the fact that she had

not taken Ibuprofen as previously recommended, and he wrote a prescription and told her to

return as needed (Tr. at 117).

Plaintiff was not seen in connection with her kidney problems again until December 24,

2001 (Tr. at 116). She presented with right flank pain in her right upper quadrant that extended

around her back (Tr. at 116).  The pain was "similar to the pain she experienced earlier this year

when a large cyst was identified and drained with CT guidance," which "did resolve her

discomfort" (Tr. at 116).  A bilateral renal ultrasound showed a 4.5 cm cyst with probable

"intrarenal obstruction and hydronephrosis"[3] as the cause of Plaintiff's pain (Tr. at 116).

Plaintiff's cyst was drained for a second time on January 4, 2002; approximately 60 cc of

serous fluid was aspirated (Tr. at 95-97).  "Following the aspiration, the [5.3 cm] cyst appeared

completely collapsed.  No perinephric fluid collections were identified following aspiration" (Tr.

at 96-97).  On January 28, 2002, Plaintiff requested a refill of Lortab[4] (Tr. at 116).  Dr. Pearson

called in the prescription, but noted in her file that Plaintiff would receive "no more refills" (Tr.

at 116).

On March 11, 2002, Plaintiff again complained of "some right pain that [was]

intermittent, not persistent" (Tr. at 115).  A renal ultrasound revealed a 3 cm right renal cyst (Tr.

at 115).  By June 3, 2002, Plaintiff complained of moderate to severe right flank pain (Tr. at 105-

106).  She stated that the pain had started two weeks ago and was getting worse (Tr. at 105-106).

---

[3] "Hydronephrosis" is defined as "[d]ilation of the pelvis and calices of one or both kindeys resulting from obstruction to the flow of urine."  STEDMAN'S MEDICAL DICTIONARY 817(26th ed. 1995)

[4] Lortab is a narcotic analgesic used to treat moderate to severe pain.

When asked why she had not called before this time, Plaintiff responded that "she just didn't" (Tr. at 115). She first presented at The Urology Group requesting pain medication (Tr. at 115). When they advised Plaintiff they could not give her any (Tr. at 115), Plaintiff went to the emergency room (Tr. at 105-106). There, a pelvic sonogram showed that the cyst on Plaintiff's right kidney had increased in size to 5.4 x 4.2 x 4.6 cm (Tr. at 101, 105-106). Plaintiff felt decreased pain after being given Torodol[5] (Tr. at 105-106).

On June 4, 2002, Plaintiff saw Dr. Pearson and an ultrasound confirmed the recurrence of a right posterior renal cyst (Tr. at 114). Plaintiff described her pain as consistent with the previous cyst pain that was relieved with the CT-guided drainage; she also reported unassociated low, mid back pain (Tr. at 114). Dr. Pearson wrote Plaintiff a prescription for Lortab 5mg, which she was instructed to alternate with Advil (Tr. at 114).

On June 10, 2002, Plaintiff met with urologist Dr. Howard W. Follis for evaluation of her right renal cyst and consideration of possible laparoscopic removal (Tr. at 121). She had been taking Lortab as needed (Tr. at 121). The cyst was laparoscopically drained and the cyst wall was excised on July 15, 2002 (Tr. at 120, 135-136). Plaintiff had an "excellent postoperative recovery" and, on October 28, 2002, had "no discomfort or flank pain at all" (Tr. at 135-136).

On December 11, 2002, after being involved in a car accident, Plaintiff reported right flank/abdominal pain (Tr. at 144). Dr. Pearson reported that Plaintiff's pain was "nonspecific, not associated with any particular activity" (Tr. at 144). A renal ultrasound revealed normal kidneys, consistent with her recent unroofing (Tr. at 144). Dr. Pearson then referred Plaintiff to Dr. Magill, "as her pain appears more abdominal or perhaps uterine or ovarian in etiology" (Tr.

---

[5] Torodol is a nonsteriodal anti-inflammatory drug that works by reducing chemicals that cause inflamation and pain in the body. It is used to treat moderate pain.

8

Case 6:04-cv-03572-REL   Document 12   Filed 09/09/05   Page 8 of 20

at 144).

Plaintiff saw Dr. Magill on December 18, 2002, and complained of pelvic discomfort and abdominal pain that was "crampy in character" (Tr. at 148). An examination revealed probable irritable bowel syndrome and probable metritis[6] (Tr. at 148). Dr. Magill prescribed Plaintiff Doxycycline,[7] 100mg twice daily and Robinul,[8] 2mg twice daily (Tr. at 148).

On January 21, 2003, Plaintiff followed up with Dr. Magill to evaluate the efficacy of her treatment program (Tr. at 150). Plaintiff's uterus was entirely nontender (Tr. at 150). Dr. Magill's assessment included (1) resolution of Plaintiff's metritis, and (2) continued abdominal discomfort (Tr. at 150). He recommended Plaintiff see her nephrologist and stated that if her discomfort was not resolved, he would refer her to a gastroenterologist (Tr. at 150).

On February 19, 2003, Plaintiff returned to see Dr. Follis (Tr. At 131-132). She reported that she continued to have flank pain and had been taking Lortab as needed (Tr. at 131-132). Plaintiff's pain was intermittent and occurred occasionally and "did not have a colicky nature" (Tr. at 131-132). Dr. Follis noted that Plaintiff had "complained of some right-sided flank pain since mid-December, when she was involved in a motor vehicle accident. Interestingly, she had a complete disappearance of her pain after the laparoscopic cyst removal was accomplished" (Tr. at 131-132). "She was seen by Dr. Pearson sometime in December, where apparently an office ultrasound was done and Dr. Pearson told her that the kidney appeared to be healing normally. She then went to Dr. McGill, who put her on some antibiotics, which helped her quite a bit" (Tr.

---

[6] "Metritis" is inflammation of the uterus. STEDMAN'S MEDICAL DICTIONARY 1108 (26th ed. 1995)

[7] Doxycycline is an antiobiotic.

[8] Robinul reduces secretions of certain organs.

9

at 131-132). A CT scan revealed that the right renal cyst had not returned and Dr. Follis noted that there was "nothing on the CT that explain[ed] her right flank pain" (Tr. at 129-130). He then referred her to her family doctor (Tr. at 129-130).

On July 21, 2003, Plaintiff returned to Dr. Magill with complaints of continued abdominal pain and bloating (Tr. at 150). His notes stated he would refer Plaintiff to gastroenteralogy (Tr. at 150). A CT scan showed that her renal cyst was gone. However, the film also showed a small bowel mass that was not present on previous examination (Tr. at 125-126). A note from Dr. Magill dated October 21, 2003, stated that Plaintiff was expected to undergo a diagnostic laparoscopy sometime in November of 2003 to diagnose this condition (Tr. at 202).

## C. SUMMARY OF TESTIMONY

During the hearing, plaintiff testified; and Dr. Cathy Hodgson, a vocational expert, testified at the request of the ALJ.

### 1. Plaintiff's testimony.

Plaintiff was born September 18, 1952, and has a high school education (Tr. at 214). Although Plaintiff has some difficulty reading, she is able to generally understand the contents of what she is reading even if she does not know every word (Tr. at 214-215). When asked by the ALJ whether she could "write a short letter or postcard, [or] a grocery list," Plaintiff testified that she could (Tr. at 215).

Plaintiff stated that she was 5' 7" and, at the time of the hearing, weighed one hundred and fifty pounds (Tr. at 215). Plaintiff indicated that she had gained approximately twenty-five pounds within the last year, which she attributed to having surgery (Tr. at 215).

10

When questioned about her employment history, Plaintiff stated that she had worked as a motel housekeeper until June of 2001 without difficulty (Tr. at 217). After this date, however, Plaintiff was not able to continue working (Tr. at 217). She learned that she had a cyst on her kidney, which made it difficult for her to sit up and walk (Tr. at 218).

Plaintiff sought treatment from Dr. Pearson, who later referred her to Dr. Follis (Tr. at 218). On September 30, 2002, Dr. Follis removed the cyst from Plaintiff's right kidney laparoscopically (Tr. at 218). The procedure was initially beneficial, but Plaintiff's condition worsened (Tr. at 219). She testified that months after the laparoscopy, she began suffering from infections, was unable to sit up, and "couldn't hardly move or go anywhere" (Tr. at 219).

At the time of the hearing, Plaintiff felt pain in her back, side, and in the lower part of her stomach (Tr. at 219). Plaintiff's back pain was centralized in the lower, right side (Tr. at 219). She reported she suffered from pain a "majority of the time" over the last nine months and noted that she did not feel the pain prior to surgery (Tr. at 219). Plaintiff described her pain as "burning" and stated that it felt like "a lot of pressure" on her spine, back and right side (Tr. at 220). The pain extends halfway down through Plaintiff's right thigh and into her joint (Tr. at 220).

Plaintiff's stomach and lower abdominal pain is also located on her right side (Tr. at 221). She characterized her abdominal pain as "a burning sensation" but stated that she also experiences "sharp pains" like someone is punching her (Tr. at 221). This pain "comes and goes" and usually occurs when Plaintiff is sitting (Tr. At 221).

Certain activities aggravate Plaintiff's pain (Tr. at 220). She cannot walk more than half of a block (Tr. at 220) or sit/stand in one position for longer than fifteen minutes (Tr. at 221-

11

222); Plaintiff also testified that she could lift and carry less than ten pounds (Tr. at 222).

The majority of Plaintiff's day is spent lying in her Craftmatic bed, only getting up to fix meals and do limited housework (Tr. at 222-223). When fixing meals, Plaintiff cannot stand very long over the stove (Tr. at 222). She states that she is able to "put the food on," but then sits down until it is time to "turn it over" (Tr. at 222). Similarly, Plaintiff also has difficulty standing long enough to clean her home (Tr. at 223). For instance, it takes Plaintiff approximately one hour to mop the kitchen since she can only stand for fifteen minutes (Tr. at 223). Plaintiff's sons, ages twenty-two and twenty-six, occasionally help around the house and with yard work, although Plaintiff tries to do the work herself a majority of the time (Tr. at 223). Plaintiff only leaves her home for occasional doctors' appointments or to go to the grocery store (Tr. at 224). She drives herself to and from these outings and reports doing so approximately two times a week (Tr. at 225). At the grocery store, Plaintiff only gets what she needs and does not stay long (Tr. at 224). Sometimes she has to lean on the cart while shopping (Tr. at 224).

Plaintiff's husband passed away on September 28, 2003 (Tr. at 224). Before his death, Plaintiff provided care to her husband, as he was quadriplegic and could not walk (Tr. at 225). She was unable to care for him alone, however, and had others – including her sons – come into her home to help (Tr. at 225).

Plaintiff concluded by stating that she plans to have another laparoscopic procedure to further explore the cause of her back pain.

**2.      Vocational expert testimony.**

Vocational expert Dr. Cathy Hodgson testified at the request of the ALJ. Dr. Hodgson stated that Plaintiff's past relevant work was that of a motel maid, which was light unskilled

12

labor, and a childcare attendant, which was medium unskilled labor (Tr. at 227-228). The ALJ then asked whether Plaintiff could perform her past work within the following hypotheticals.

The ALJ first hypothesized an individual who was 48 to 51 years old, had a high school education, and had Plaintiff's past relevant work (Tr. at 228). The hypothetical also assumed that due to a history with a renal cyst and irritable bowel syndrome, and current experience with right flank, right leg and abdominal pain, the individual could perform no more than light work that: (1) would not involve significant unprotected heights; (2) was not potentially dangerous and/or involved unguarded moving machinery or commercial driving; (3) involved lifting and carrying up to twenty pounds, and frequently ten pounds; (4) would be in a low-stress work environment with simple, repetitive instructions and that would not involve customer service; and (5) that had restrictions secondary to possible distraction from general medical conditions and pain (Tr. at 228). Dr. Hodgson testified that such an individual would be able to perform the position of a motel maid as generally performed in the national economy (Tr. at 229).

The ALJ's second hypothetical was the same as her first, but the ALJ also asked Dr. Hodgson if the ALJ found Plaintiff's self-described limitations were credible (i.e., that she could not sustain eight hours of sitting, standing, or walking at any exertional level), whether an individual suffering from those restrictions could perform past relevant work (Tr. at 229). Dr. Hodgson testified that there would be no competitive work available for that person (Tr. at 229).

### D.  FINDINGS OF THE ALJ

On March 5, 2004, the ALJ issued her opinion finding that Plaintiff was not disabled at step four of the sequential analysis.

According to step one, the ALJ found that Plaintiff had not worked since her onset date,

June 27, 2001 (Tr. at 17). She next found that Plaintiff's kidney problems constituted a medically determinable, severe impairment (Tr. at 17). At step three of the analysis, the ALJ found that Plaintiff's impairment, or combination of impairments, did not meet or equal a listed impairment (Tr. at 17).

Ultimately, however, the ALJ found that Plaintiff's impairment did not prevent her from performing past relevant work (Tr. at 17). In doing so, the ALJ specifically discredited Plaintiff's testimony describing her medically-imposed conditions and found Dr. Hodgson's testimony credible (Tr. at 17). The ALJ found that Plaintiff retained the residual functional capacity for a wide range of light work and was able to return to her past relevant work as a motel maid (Tr. at 17).

## V. CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible.

### A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson,

14

956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including the plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as the plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski, 739 F.2d at 1322.

The specific reasons listed by the ALJ for discrediting Plaintiff's subjective complaints of disability are as follows:

> [T]he claimant has a limited work history, with relatively low earnings, and periods with no work. Although the claimant alleged at the hearing that she has to lie down for most of the day due to her problems, the medical records do not show this level of complaint to her treating physicians. She describes greatly reduced daily activities, but the record does not show that this would be required by her medically determined impairments. She alleges pain, and the medical condition could be expected to produce some pain, but not at the level to cause the restrictions alleged to Social Security.

(Tr. At 16).

**1.  *PRIOR WORK RECORD***

Plaintiff's earnings record demonstrates that she worked sporadically and earned very little over her lifetime. Her highest annual earnings occurred in 1998 when she made $10,329.49. Her average annual earnings for the thirty-three years she has worked is $2,692.08. This factor supports the ALJ's credibility determination, as Plaintiff's lack of employment is not likely due to her disability.

15

## 2. *DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS*

At the November 4, 2003 hearing, Plaintiff testified that she suffered from pain a "majority of the time" over the past nine months and that she did not feel pain before she had surgery (Tr. at 219). She described her pain as a "burning sensation" and felt "sharp pains" in her abdomen (Tr. at 221) and "a lot of pressure" in her spine and back that extended down through her right thigh and into her joint (Tr. at 220). Plaintiff also noted that months after her September 30, 2002 laparoscopy, infections rendered her unable to sit up and she "couldn't hardly move or go anywhere" (Tr. at 219).

By contrast, Plaintiff's medical records do not contain complaints of the same severity. Specifically, on March 11, 2002, Plaintiff described of "some right pain that [was] intermittent, not persistent" (Tr. at 115). Although she again complained of moderate to severe right flank pain on June 3, 2002, she waited two weeks to report this pain to her doctors (Tr. at 105-106, 115). By October 28, 2002 - following draining the cyst and excising the cyst wall - Plaintiff had "no discomfort or flank pain at all" (Tr. at 135-136).

Plaintiff again reported right flank/abdominal pain on December 11, 2002, after being involved in a car accident (Tr. at 144). Dr. Pearson noted that she had "nonspecific tenderness through out the mid and lower abdomen, not in the flank" (Tr. at 144). A renal ultrasound also revealed normal kidneys (Tr. at 144). On December 18, 2002, Plaintiff complained of pelvic discomfort and abdominal pain that was "crampy in character" and was diagnosed with irritable bowel syndrome and metriris (Tr. at 148). When she reported continued pain on January 21, 2003, Dr. Magill recommended she see Dr. Follis (Tr. at 150).

On February 19, 2003, Plaintiff described her pain to Dr. Follis as "intermittent and

16

occurred occasionally" (Tr. at 131-132). Dr. Follis noted that Plaintiff had:

> complained of some right-sided flank pain since mid-December, when she was
> involved in a motor vehicle accident. Interestingly, she had a complete
> disappearance of her pain after the laparoscopic cyst removal was accomplished.
> She was seen be Dr. Pearson sometime in December, where apparently an office
> ultrasound was done and Dr. Pearson told her that the kidney appeared to be
> healing normally. She then went to Dr. Magill, who put her on some antibiotics,
> which helped her quite a bit.

(Tr. at 131-132). He also advised that "nothing on the CT . . . explain[ed] her right flank pain"

(Tr. at 129-130). On July 21, 2003, a follow-up CT scan confirmed that Plaintiff's renal cyst

was gone and that "surgery was successful" (Tr. at 126). Because the film also showed a small

bowel mass, Dr. Follis referred Plaintiff to her family doctor (Tr. at 129-130).

The record supports the ALJ's finding that the duration, frequency, and intensity of

Plaintiff's level of complaints to her treating physicians were not as severe as her complaints at

the hearing. Although Plaintiff testified that she suffered from pain "a majority of the time," the

record contains complaints of intermittent, occasional pain, an occasion where Plaintiff waited

two weeks to report such pain, and even contains periods when Plaintiff did not suffer from pain

at all. I, therefore, find that this factor supports the ALJ's credibility analysis.

## 3. DAILY ACTIVITIES

Plaintiff testified that her impairments required her to lie down most of the day (Tr. at

222-223). She also testified that she could not walk for more than half of a block (Tr. at 220),

sit/stand in one position for loner than fifteen minutes (Tr. at 221-222), or lift and carry more

than 10 pounds (Tr. at 222). In accordance with these limitations, Plaintiff testified that she

drove herself to the grocery store and to doctors' appointments (Tr. at 225), did her own

shopping and fixed her own meals (Tr. at 222, 224), cleaned for limited periods of time and often

with assistance (Tr. at 223-224), and cared for her quadriplegic husband before his death with the help of others (Tr. at 225).

As noted by the ALJ, Plaintiff never complained of such severe limitations to her treating physicians. Although it is evident from the record that Plaintiff did experience some level of pain, she only described her impairment to her doctors as causing intermittent, occasional pain. Plaintiff never reported being so restricted by her pain, nor did her doctors ever place her on any such restrictions. As a result, the record supports the ALJ's finding that Plaintiff's pain did not require these greatly reduced daily activities.

### 4. *PRECIPITATING AND AGGRAVATING FACTORS*

Plaintiff testified that her pain was aggravated by walking, sitting and standing (Tr. at 220). She also stated that she could not lift and/or carry more than ten pounds (Tr. at 222). Plaintiff stopped working on June 26, 2001, because the pain prevented her from being able to perform her job (Tr. at 68, 217). However, Dr. Hodgson's testimony indicated Plaintiff's impairments would not be so debilitating. Dr. Hodgson opined that an individual who had a history with renal a renal cyst and irritable bowel syndrome and who currently experienced right flank, right leg and abdominal pain could still perform light work, such as that of a motel maid, with lifting and carrying restrictions (Tr. at 229). Because the record supports the ALJ's credibility determination regarding the duration, frequency and intensity of Plantiff's symptoms (*infra*, Part V.A.2) and reduced daily activities (*infra*, Part V.A.3), this factor supports the ALJ's credibility analysis that Plaintiff's impairments did not aggravate her pain to the point that she could not perform past work.

18

**5.** *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

The record contains very little evidence concerning Plaintiff's medications during the relevant time frame. At all times pertinent to this inquiry, Plaintiff took Accupril to manage her high blood pressure. On June 3, 2002, Plaintiff reported decreased pain after being given Torodol in the emergency room (Tr. at 106). She was prescribed Lortab 5mg on at a June 4, 2002 office visit, and was instructed to alternated the Lortab with Advil (Tr. at 114). Plaintiff's medical records indicate that she continued taking Lortab on an "as-needed" basis. Additionally, Dr. Magill prescribed Robinul (reduces secretions of certain organs) an Doxycyline (antiobiotic) on December 18, 2002 (Tr. at 148), which helped her "quite a bit" (Tr. at 131-132). Plaintiff testified that she did not suffer any negative side effects from these medications (Tr. at 216).

The substantial evidence in the record establishes that Plaintiff's medications worked well. Over the course of Plaintiff's condition, her pain was consistently managed with Lortab; the record does not indicate doctors ever modified her pain management plan or thought that taking Lortab on an "as-needed" basis was not effective. Furthermore, Plaintiff suffered no side effects from her medications. This factor supports the ALJ's credibility determination.

**6.** *FUNCTIONAL RESTRICTIONS*

The record does not reveal that Plaintiff's doctors placed her on any restrictions.

### B. CREDIBILITY CONCLUSION

For all the reasons discussed above, I find that the record contains substantial evidence supporting the ALJ's finding that Plaintiff's subjective complaints were not credible. Plaintiff's motion for summary judgment on this basis is, therefore, denied.

19

## VI. SEVERITY OF IMPAIRMENTS IN COMBINATION

Plaintiff next argues that the ALJ failed to consider the severity of her impairments in combination. She states that "both from the medical records in evidence, and claimant's testimony regarding subjective complaints of pain and discomfort, it is apparent that Ms. Bowles suffers greatly from her impairments in combination and has significant problems controlling her medical conditions." However, Plaintiff fails to demonstrate that the ALJ evaluated her impairments in isolation and does not identify the impairments she alleges the ALJ failed to consider.

A review of the ALJ's decision shows that she did, in fact, give full consideration to all of the evidence. Specifically, the ALJ evaluated the effect of Plaintiff's renal cyst, asymptomic kidney stones, irritable bowel syndrome, metritis, and possible bowel mass (Tr. At 15) -- every condition from which the medical records and Plaintiff's testimony suggest she suffers. Because the ALJ did not err in discrediting Plaintiff's subjective complaints of pain and considered the record as a whole, I find that the ALJ properly determined that Plaintiff retained the residual functional capacity for a wide range of light work.

## VII. CONCLUSIONS

Therefore, it is

ORDERED that Plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

*/s/ Robert E. Larsen*
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
September 8, 2005

20